UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
at PIKEVILLE

CRIMINAL ACTION NO. 7:06-03-KKC

UNITED STATES OF AMERICA　　　　　　　　　　　　　　　　　　　　　PLAINTIFF

v.　　　　　　　　　　　　　　　**OPINION AND ORDER**

TEDDY RAY MANNS　　　　　　　　　　　　　　　　　　　　　　　　　DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on a *pro se* action by Defendant Teddy Ray Manns ("Manns") pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Rec. 206. Pursuant to local practice, this matter was referred to Magistrate Judge Edward B. Atkins who issued a Report and Recommendation on February 8, 2010, recommending that Manns' motion be denied. Rec. 211. Manns timely filed written objections to the Magistrate's Report and Recommendation. Rec. 214. Accordingly, this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. 28 U.S.C. § 636(b)(1)(B).

I. **TRIAL COUNSEL'S FAILURE TO REHABILITATE A JUROR STRICKEN FOR CAUSE.**

Manns first argues that he was denied effective assistance of counsel by his trial counsel's failure to attempt to rehabilitate a juror during voir dire. Manns claims that the failure to rehabilitate Juror 90 was unreasonable and contrary to established professional norms. Rec. 210 at 7. Further, Manns asserts that prejudice should be presumed in this case because Juror 90 did not clearly indicate that he could not be impartial and trial counsel's failure to attempt to

rehabilitate the juror has left him with a limited record to determine whether rehabilitation would have been successful. *Id.* at 9.

The Magistrate Judge recommended that this claim be denied because counsel's performance was not constitutionally deficient and because Manns failed to show prejudice as required by *Strickland*. Manns' only response in objection to the Report and Recommendation is that his trial counsel's failure to object to the motion to strike Juror 90 and failure to attempt to rehabilitate that juror was ineffective assistance of counsel and that prejudice has been established as a result. Rec. 214 at 1-2.

During voir dire, Juror 90 indicated that he had a niece who was a Lexington police officer. The following questioning then ensued:

> THE COURT: Are you very close to your niece?
>
> THE JUROR: I see her all the time.
>
> THE COURT: Do you talk frequently about the work that she does?
>
> THE JUROR: Yes, I do.
>
> THE COURT: As a result of your relationship with your niece, would that affect your thinking about this particular case in any way?
>
> THE JUROR: Probably so.
>
> THE COURT: It's very important that people who come before the courts get a fair trial by an impartial jury, and we need citizens to serve on the jury. Could you set aside your relationship with your niece and judge this case based on the evidence here before this Court?
>
> THE JUROR: I really don't know that I can answer that. I'm hoping that I could.
>
> THE COURT: All right. We may hear from you later here at the bench. Thank you very much.

Rec. 164, Tr. Vol. I at 26-27. Subsequently, Juror 90 was called back to the bench and the following exchange ensued:

> THE COURT: Next, please, Juror No. 90. Yes, sir? Juror No. 90, we just wanted to follow-up a little bit about the conversation that we had earlier about your niece's role in law enforcement. You said she's a Fayette County police officer.
>
> THE JUROR: Yes, she's the one that actually all the pictures in the "USA Today," the carnage that they had the wreck. She was the lady who guarded, I guess, in a sense.
>
> THE COURT: Which wreck was that?
>
> THE JUROR: The big flight.
>
> THE COURT: Oh, the Comair Flight, I understand. Mr. West, do you have some questions?
>
> MR. WEST: What's her name, sir?
>
> THE JUROR: Adrian Thomas.
>
> THE COURT: It's very important that people get a fair trial and people that sit as jurors do everything that they can to set aside their personal biases and be fair to both sides. I recognize that you told us that you have the niece in law enforcement, but would that just make it impossible for you to be fair to the defendant in this case.
>
> THE JUROR: Impossible? I don't know if that's impossible.
>
> THE COURT: Well, tell me in your words.
>
> THE JUROR: Well, I'm not sure I know – I understand your question total.
>
> THE COURT: Well, can you be fair to the defendant?
>
> THE JUROR: I'm fair to everybody. In a drug case, this word right here says that he has violated himself. Now if he does harm on someone else, then we need to have a damaged party over here. The U.S. government, under this, which is a Constitution, I don't know if they can be a damaged party. Now if he can show me evidence that this fellow damaged someone by drugs, which I'm totally against, he needs something to be done, he needs to go in rehab. We need to get somebody that was damaged by him to imprison him.

THE COURT: Okay. Mr. Ousley?

MR. OUSLEY: Right now, if you had to render a verdict, could you do that?

THE JUROR: Render a verdict?

MR. OUSLEY: Yes, according to whether he's not guilty or guilty right now, if the Judge asked you to do that.

THE JUROR: I would have to say not guilty, because you are the U.S. government against him.

MR. OUSLEY: That's correct.

THE COURT: All right. Mr. Ousley?

THE JUROR: I would like to say a damaged party is how we're going to get this person, and he is going to get some help instead of sitting in prison, instead of the State making money and they all making money. They need to go.

THE COURT: Thank you very much.

Rec. 164, Tr. Vol. I at 42-44.

The Court then held the following discussion with Mann's trial counsel and counsel for the United States to consider whether Juror 90 should be stricken for cause.

MR. OUSLEY: What did you think of No. 90?

MR. WEST: He answered the questions right. He probably shouldn't be taking his books back with him. He had a "Black's Law Dictionary," too.

THE COURT: Did he?

MR. OUSLEY: We have enough jurors. I would move to strike him.

THE COURT: You move to strike Juror No. 90?

MR. WEST: I don't object. It didn't turn out the way I thought it was going to.

THE COURT: Okay. With the United States, we have a motion to strike Juror No. 90. I will hear your grounds, Mr. Ousley.

4

MR. OUSLEY: For one thing, we have the whole police officer thing, but what struck me is when he started talking about if the United States could show that there's a damaged party. Now I anticipate that the Court will instruct the jury on the law and to follow those instructions, and nowhere in these instructions is there going to be any damaged party. You know, that's a burden that I don't have to prove, is that there's a damaged party. As a matter of fact, this is a victimless crime when you get technical about it. Of course, I would argue that any time you have drugs going out into the community there's a lot of people going to end up as a victim, society is the victim. And what he just indicated to the Court, I would have to start arguing to supplement the instructions with some kind of argument that any time there's that much drugs that's going out, it's hurting children and it's hurting other people and people are being addicted. And how many lives has the defendant ruined through the distribution of this drug and tried to? So if he's sitting up there and I know he wants to see the damaged party, I don't think that's something that I have to prove.

THE COURT: Mr. West?

MR. WEST: As I have said previously, your Honor, I think that he answered that he thought he could; in essence, he answered that he thought he could base his decision on the evidence, and his only slant was that the government hadn't presented any proof that he would return a not-guilty verdict, which I would hope that would be the same response that all the jurors would make.

THE COURT: Right. While he did answer the question correctly with respect to his willingness to acquit the defendant and to hold the government to its burden of proof, he also presented a copy of the United States' Constitution, the Bible, and I believe Mr. West, you identified a "Black's Law Dictionary." In the Court's original inquiry of this particular juror, he indicated that because of his close relationship with his niece that he had a concern about his ability to be impartial, although once approached here at the bench he indicated that he could be impartial. His appearance was one of a person of very definite ideas, and the Court has concerns that even though it would be instructing this defendant as to what law he should follow and what law he should apply, that he might have difficulty or unwillingness to follow the Court's instructions. And I base that in some part based on his demeanor as he responded to our questions. Therefore, the Court will grant the motion to strike Juror No. 90.

Rec. 164, Tr. Vol. I at 45-47.

Manns' ineffective assistance of counsel claim must be analyzed under the familiar *Strickland* framework which requires a showing that trial counsel's performance was deficient and that this deficient performance prejudiced Manns and deprived him of a fair trial. *Strickland*

5

*v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)(to show that trial counsel's performance prejudiced the defense, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."). Judicial review of the assistance of counsel is highly deferential because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

The Sixth Circuit has recognized that "[c]ounsel, like the trial court, is granted particular deference when conducting *voir dire*." *Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006)(citing *Hughes v. U.S.*, 258 F.3d 453, 457 (6th Cir. 2001)). This is because counsel's actions during voir dire are matters of trial strategy. *Hughes*, 455 F.3d at 457. Matters of trial strategy can only be the basis for ineffective assistance of counsel claims where counsel's "decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Miller v. Webb*, 385 F.3d 666, 672-73 (6th Cir. 2004).

In reviewing Manns' arguments, the Court finds it unnecessary to consider whether trial counsel's alleged failure to rehabilitate Juror 90 rose to the level of constitutionally deficient performance.[1] This is because Manns has failed to meet the prejudice prong of the *Strickland* test. Manns certainly had the right to expect that defense counsel would "protect his...constitutional right to a fair and impartial jury by using voir dire to identify and ferret out

---

[1] However, the Court wishes to note that Manns' attorney was an active participant during voir dire and successfully moved to strike at least two jurors who had close relationships with law enforcement officers. Furthermore, he indicated that he did not objection to the United States' motion to strike Juror 90 because questioning "didn't turn out the way I thought it was going to." Rec. 164, Tr. Vol. I at 45. Furthermore, the United States has cited decisions from several federal district courts rejecting ineffective assistance of counsel claims for failure to rehabilitate a juror. *See, e.g.*, *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 797 (N.D. Ohio 2003).

jurors who are biased against the defense." *Miller*, 269 F.3d at 615. However, in this case, Manns has presented no evidence how his trial was permeated with obvious unfairness. *See Hughes*, 258 F.3d at 457. He has made no allegations that any juror that was empaneled was biased against him. Furthermore, the Court can find no basis for holding that but for counsel's failure to rehabilitate Juror 90, the outcome of Manns' trial would have been different. Accordingly, Manns' ineffective assistance of counsel claim based on failure to rehabilitate Juror 90 must be denied.

**II. TRIAL COUNSEL'S FAILURE TO OBJECT TO JURY INSTRUCTIONS.**

Manns asserts that his trial counsel "deprived him of effective assistance of counsel by failing to object to the Court's jury instructions" which he claims deprived him of the right to a fair trial. Rec. 206 at 10. Manns alleges that his trial counsel should have objected to the Court's failure to adequately instruct the jury that its determination concerning the controlled substance that formed the object of the conspiracies charged in Counts I and II of the superceding indictment had to be unanimous.

Count I of the superceding indictment charged Manns with conspiring to distribute and possessing with the intent to distribute 1000 kilograms or more of marijuana, a Schedule I controlled substance. Rec. 83 at 2. Count II charged Manns with conspiring to knowingly and intentionally distribute and possessing with the intent to distribute a quantity of OxyContin pills. *Id.* at 2-3.

The Magistrate Judge recommended that Manns' ineffective assistance of counsel claim be denied because the district court's jury instructions were proper. Rec. 211 at 7. Manns has objected to the Report and Recommendation claiming that the Court failed to adequately instruct

7

the jury "that its determination concerning the controlled substance that formed the object of the conspiracy charged in Count One and Count Two of the superseding indictment had to be unanimous." Rec. 214 at 2. Manns also claims that the Report and Recommendation made no mention of Count I of the superseding indictment. For the reasons set forth below, the Court finds that Manns' ineffective assistance of counsel claim based on trial counsel's failure to object to the Court's jury instructions is without merit and must be denied.

The Court instructed the jury on multiple occasions that its verdict had to be unanimous. Rec. 166, Tr. Vol. III at 205-07. Further, the Court orally instructed the jury that "[i]f you find the defendant guilty of any of these charges, then you will be asked to unanimously determine the quantity of controlled substance involved in that offense." *Id.* at 206. With regard to Count I, the Court orally instructed the jury that "[i]f you find the defendant guilty of the crime of conspiracy to distribute marijuana, then you must also determine the amount of marijuana." *Id.* at 183. Similarly, Jury Instruction 38 informed the jury in writing that "[i]f you find the defendant guilty of any of these charges, you will then be asked to *unanimously* determine the quantity of the controlled substances involved in the offense. There is a special place on the verdict form for you to mark that quantity." Rec. 128 at 47 (emphasis added).

Based on these instructions, the Court finds that the jury was properly instructed that a unanimous decision was required on all charges requiring a specific quantity of controlled substances to be proven. With regard to Count II, the Court agrees with the Magistrate Judge that no instruction regarding quantity was required because the superseding indictment did not allege a specific quantity of OxyContin. In light of the above findings, Manns' trial counsel did not render constitutionally ineffective assistance by failing to object to the Court's jury

8

instructions, which were appropriate.

III.    **Failure to Investigate and Failure to File a Motion to Suppress Evidence Obtained by Aerial Surveillance.**

Manns' final argument is that trial counsel deprived him of his right to effective assistance of counsel by failing to properly investigate his case before trial as indicated by the failure to submit a motion to suppress evidence obtained in violation of his Fourth Amendment rights through aerial surveillance. Rec. 206 at 13-18. There is no dispute that aerial surveillance of Manns' residence was conducted by investigating officers from the Kentucky State Police on March 21, 2005 without a warrant. Police Detective Tom Underwood testified at Manns' trial regarding the investigation conduct by the Kentucky State Police.

Detective Underwood testified that "I directed Will Chaney to place a telephone call to Kristy Coleman Tackett, which was a recorded telephone call, to set a transaction for March 21st, 2005, for marijuana, as well as OxyContin tablets." Rec. 164, Tr. Vol. I at 66. At the time the transaction was being set up, Tackett was in a relationship with Manns and residing in his home. *Id.* at 97; Rec. 166, Tr. Vol. III at 31. Detective Underwood testified that he requested ground and aircraft surveillance of Manns' home to "possibly identify the source of supply for the drugs, where they were actually coming from." Rec. 164, Tr. Vol. I at 96-97. Officer Doyle Wilson of the Kentucky State Police was one of the officers in the plane conducting the aerial surveillance on March 21, 2005. *Id.* at 185-86. He testified that the plane being used was "a National Guard aircraft that's equipped with video equipment, zoom lens video equipment, and also infrared equipment for nighttime surveillance." *Id.* at 187. The controlled buy that the plane was observing was supposed to occur at around noon on March 21, 2005. *Id.* at 188-89.

9

Office Wilson then testified that at approximately 11:00 a.m., he observed:

> what appeared to be a male subject walking in front of the house coming towards the driveway where there was two vehicles parked. He drops a bag in front of the car that's in the driveway and walked out towards there's some chicken coops outside beside the driveway. And then a short time later I observed what appeared to be a female come out of the house, walks and talks to the defendant, or the male subject that was there. The female subject walks back over to the front of the car, picks up the bag that was dropped, puts it in the passenger side of the vehicle, and then she leaves.

*Id.* at 186, 189.

In *Kimmelman v. Morrison*, 477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986), the Supreme Court indicated that trial counsel's failure to file a motion to suppress is not *per se* ineffective assistance of counsel. *Id.* at 384. However, the failure to file a suppression motion must be based on an actual strategic decision by trial counsel. *Id.* at 385. In *Kimmelman*, the Court found that trial counsel's failure to file a suppression motion was not a strategic decision because the record clearly revealed that the attorney "was unaware of the search and of the State's intention to introduce the bed sheet into evidence." *Id.* Furthermore, trial counsel was unapprised of the search and seizure because he had conducted no pretrial discovery." *Id.*

In this case, the record reflects that Manns' attorney was aware prior to proceeding to trial that evidence had been obtained via aerial surveillance of Manns' home. Manns acknowledges as much in his motion to vacate. Specifically, Manns represented that:

> [p]rior to Petitioner's trial, Petitioner requested that his counsel contact previous counsel of record Lowell E. Spencer whom had advised Petitioner that the aerial surveillance was a possible violation of the Fourth Amendment. Although knowing this information, Petitioner's counsel advised that since the aerial surveillance had been conducted from public, navigable airspace there was no standing to challenge the search.

Rec. 206 at 17 (quotations omitted). In reviewing Manns' arguments and the evidence in the record, the Court finds that the decision not to file a motion to suppress was a strategic decision.

The remaining question is whether this strategic decision was clearly unreasonable.

In order to show that the aerial surveillance in this case violated the Fourth Amendment, Manns must meet the familiar *Katz* test which requires showing that: (1) he manifested a subjective expectation of privacy in the object of the challenged search; and (2) that society is willing to recognize that expectation as reasonable. *Katz v. United States*, 389 U.S. 347, 360, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)(Harlan, J., concurring); *see also Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979). For purposes of this motion, the Court will assume that Manns manifested a subjective expectation of privacy in the activities that were going on in his driveway. While there is no indication that Manns protected the area from aerial view, he claims that he strategically obscured the area using chicken coops. Accordingly, the Court will consider whether society would recognize his subjective expectation of privacy as reasonable.

Manns stresses that because the area observed was within the curtilage of his home and there was no search warrant, the aerial surveillance violated his Fourth Amendment rights. This type of argument has been addressed by the Supreme Court and is clearly without merit. In *California v. Ciraolo*, 476 U.S. 207, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986), the Supreme Court addressed an argument by the respondent that "because his yard was in the curtilage of his home, no governmental aerial observation is permissible under the 4th Amendment without a warrant." *Id.* at 212. The Court rejected the argument, explaining that simply because an:

> area is within the curtilage does not itself bar all police observations...[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be

11

and which renders the activities clearly visible....What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

*Id.* at 213. Ultimately, the Court concluded that the aerial observations of the respondent's curtilage did not violate an expectation of privacy that society was prepared to honor because it took place in navigable airspace and was conducted in a physically non-intrusive manner. *Id.* at 213-14.

The Supreme Court has also spoken to issues of aerial surveillance and the Fourth Amendment on a number of other occasions. For example, in *Florida v. Riley*, 488 U.S. 445, 109 S. Ct. 693, 102 L. Ed. 2d 835 (1989), Riley:

> lived in a mobile home located on five acres of rural property. A greenhouse was located 10 to 20 feet behind the mobile home. Two sides of the greenhouse were enclosed. The other two sides were not enclosed but the contents of the greenhouse were obscured from view from surrounding property by trees, shrubs, and the mobile home. The greenhouse was covered by corrugated roofing panels, some translucent and some opaque. At the time relevant to this case, two of the panels, amounting to approximately 10% of the roof area, were missing. A wire fence surrounded the mobile home and the greenhouse, and the property was posted with a "DO NOT ENTER" sign.

*Id.* at 448. After an investigating officer was unable to see the contents of the greenhouse from the road, he performed an aerial surveillance of the property by helicopter at a height of 400 feet and was able to see through the openings in the roof and the open sides of the greenhouse what he thought was marijuana. *Id.* Despite finding that the property surveyed was within the curtilage of Riley's home, the Supreme Court found that "Riley could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter had it been flying within the navigable airspace for fixed-wing aircraft. *Id.* at 451. The plurality further explained that its decision was informed by the fact that the helicopter was not violating the law in flying 400 feet over Riley's property, did not interfere with Riley's normal use of his

property or curtilage, no intimate details of the home were observed, and there was no undue noise, wind, dust or threat of injury. *Id.* at 451-52.

In light of the Supreme Court's decisions in *Riley* and *Ciraolo*, this Court finds that Manns did not have a subjective expectation of privacy that society would find reasonable. Manns took no steps to protect the area observed from aerial observation. Unlike *Riley* and *Ciraolo*, Manns made no effort to cover the area to make it more difficult for his activities to be observed from above. There is also no evidence in the record that the aerial surveillance in this case interfered with Manns' normal use of his home or any part of his curtilage. The surveillance was conducted in a physically non-intrusive manner and Manns has not alleged that it created undue noise, wind, dust, or created a threat of injury to him or any other person on his property. The Court also finds that the aerial surveillance in this case did not result in the observation of any intimate details of Manns' home. Finally, the surveillance took place in the public navigable airspace.

Manns also argues that because the airplane used by the Kentucky State Police was equipped with zoom lens equipment, video equipment and infrared equipment, this case is distinguishable from the cases discussed above. However, the trial testimony indicates that the surveillance was performed at around 11 a.m. Thus, there is no indication that the use of infrared technology was required. With regard to the zoom lens equipment, it is unclear from the record whether what was observed by the officers was magnified using this equipment. However, the Supreme Court recognized in *Dow Chemical Company v. United States*, 476 U.S. 227, 238-39, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986) that:

[i]t may well be...that the surveillance of private property by using highly sophisticated

> surveillance equipment not generally available to the public such as satellite technology, might be constitutionally proscribed absent a warrant....[However]...The mere fact that human vision is enhanced somewhat, at least to the degree here [by aerial photographs], does not give rise to constitutional problems.

*Id.* at 238-39. In this case, the Court agrees with the Magistrate Judge's determination that because the activities observed were clearly visible from the air Manns is unable to meet the second prong of the *Katz* test, requiring a showing that his subjective expectation of privacy was one that society would accept as reasonable. There is no indication that the police used sophisticated surveillance equipment unavailable to members of the general public traveling in the navigable airspace above Manns' property. Because a motion to suppress the evidence obtained by aerial surveillance would have been successful, the Court finds that Manns' trial counsel made a reasonable strategic decision to not file such a motion. As discussed above, trial counsel was clearly aware of the existence of the surveillance video and the means by which it was obtained. However, he attempted to explain to Manns that in light of Supreme Court precedent a motion to suppress would not be successful.

The Magistrate Judge's Report and Recommendation also correctly notes that Manns has failed to make the required showing under the second prong of the *Strickland* test. Even assuming that Manns' attorney had been constitutionally ineffective by failing to file a motion to suppress the evidence obtained by aerial surveillance, he has not shown "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 447 U.S. at 375. A review of the trial transcript indicates that the United States presented sufficient evidence to convict Manns even if the videotapes obtained by aerial surveillance had been excluded. This evidence includes testimony from

numerous witnesses and law enforcement agents who were involved in and observed drug transactions that Manns was involved with. Accordingly, Manns' arguments related to the failure to file the motion to suppress are without merit.

IV. **CONCLUSION**

For the reasons set forth above, it is **HEREBY ORDERED** as follows:

(1) The statement of facts and legal conclusions contained in the United States Magistrate Judge's Report and Recommendation (Rec. 211) are **ADOPTED** and **INCORPORATED** herein by reference;

(2) Manns' objections to the Magistrate Judge's Report and Recommendation are **OVERRULED;**

(3) Manns' motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (Rec. 206) is **DENIED;**

(4) A certificate of appealability, if requested, shall not issue because Manns has not made a substantial showing of the denial of any substantive constitutional right; and

(5) Judgment will be entered contemporaneously with this opinion and order in favor of the United States of America.

This the 20th day of April, 2010.

Signed By:

*Karen K. Caldwell*

**United States District Judge**